Good morning, your honors. May it please the court. My name is Andrew Sachs from Norfolk, and I'm here on behalf of the appellant, Anthony L. Burfoot. Mr. Burfoot was the elected city of Norfolk at the time of the trial. However, he was convicted of six of eight counts involving allegations of honest services wire fraud, counts one and two, Hobbs Act violations, counts three and four, and perjury counts seven and eight, while he had been a city councilman and the vice mayor of the city of Norfolk prior to his election as city treasurer. He was acquitted of counts five and six, which were also perjury counts somewhat related to the counts seven and eight of which he was convicted. As the court knows, as it has been discussed, there are a number of issues we have raised. In the time I have, of course, it would not be possible to cover them all. Those I cover are the ones I'm going to try to hopefully emphasize to the court, not to suggest that the others aren't just as important and that we're abandoning anything, but for practical reasons, I will discuss what I can in the time allotted. The first issue, Your Honors, that I'd like to bring to your attention is issue number two, which is found at pages 17 and 19 of our brief. This is our Rule 29 motion to dismiss counts one and two, the wire fraud, honest services wire fraud convictions, and three and four, the Hobbs Act convictions on the grounds that the government's evidence, even in the light most favorable to it, established not a bribery scheme with the Tyvesk Company that was the central focus of those counts, but established at most a conflict of interest between Mr. Burfoot and his duties as a city councilman and as the mayor of the city of Norfolk. Now, the government's evidence in the case was that Mr. Burfoot was a silent partner in the Tyvesk Company in 2005, and that sometime later in 2005 that Mr. Burfoot agreed to divest his silent interest in Tyvesk in exchange for $250,000. Dwight Etheridge, a central government witness, testified that the defendant's $250,000 interest would be paid through ensuing profits.  Mr. Burfoot? Sir? Mr. Burfoot, according to the evidence, cast certain votes on ordinances that were argued were favorable for the Tyvesk Company, and to some extent- Why isn't that the very definition of bribery? Well, it's because of the way the scheme arose. In this case, the agreement was, according to the evidence, that he had an interest in this company, he was cashing it out, and the way it would be compensated. But you just indicated that he got the interest by virtue of casting certain votes in favor of the company and its owners. That's true, but he did that because he had an undisclosed conflict of interest with his duties because what he was doing- Well, that may be an additional point, but I'm still struggling as to why his casting of votes in favor of the company and its owners in exchange for an interest in the company is not bribery. Well, it's our position, Your Honor, again, that without arguing with His Honor, that the circumstances of this case, again, the genesis of all of this, is a conflict of interest and not a bribe. Mr. Sachs? Yes, Your Honor? Judge Diaz's question to you was basically the consideration for his interest in the It's different if you said the silent part, meaning I paid a pre-existing equitable interest in a company and then I want to buy out, so then I'm just being paid out, it's not bribery, that's a conflict of interest. But you're conceding, as the evidence kind of clearly showed, that the consideration for the interest was the bribery itself. You just said that. Well, I agree with Your Honor. I don't disagree with the evidence in the light most favorable. But again- I mean, isn't that the direct evidence? That's undisputed. Well, it was disputed by the defense, of course, but- I thought you just conceded that your client received his equitable interest in the entity by accepting bribes or favors. I concede that all I was saying is that we contested that he did anything. But yes, I concede that the evidence that the government presented was that the remuneration for his cashing out were things that he did as an official. But as I read Skilling, and it's a nuance, it's a fine distinction, we would submit that, and I guess just to give the court the specific language from Skilling, the court said, undisclosed self-dealing by a public official or a private employee, i.e., the taking of an official action by the employee that furthers his own undisclosed financial interest while purporting to act in the interest of those to whom he owes a fiduciary duty does not fall within these statutes. So yes, Skilling says you can take an official action, which the government says Mr. Burford did, and that you can receive some benefit to yourself, which is not disclosed to the public that you're getting it because you're cashing out an interest that you have a silent partnership agreement with. So I don't think Skilling excludes the taking of official action that says every official action that you take in exchange for something of value is automatically a bribe. Right, but the government's theory of the case was entirely different. It was that Mr. Burford was demanding this money in return for him giving this support. And why doesn't the evidence support, and why wasn't the jury entitled to find that he was accepting this money and demanding it? I mean, he was asking for, you know, the first payment was too large. What was it, $30,000 or whatever? He said, or $40,000? He said, you've got to break it down. I want it in smaller amounts. He was the one who was setting the terms of how he was going to be paid, and he was doing it. The timing was critical in the case. The numbers of times he and Dwight Etheridge conferred before the Midtown vote, all of this is the factual basket that was put before the jury. So your theory was rejected by the jury, and it seems to me what you're asking, and I promise I'll end the question, but what you're asking is that you're asking us to accept your theory that the jury rejected. Why isn't that what you're doing today? Well, our theory of trial was that this didn't happen at all. That was our trial defense, that Mr. Burford and many, many officials testified, dozens of people, attorneys, city officials, former city officials, council members, that Mr. Burford never did any of these things that this group of felons and people with promises for reductions of sentences, that kind of witness said. So with respect to that, Your Honor, I would say that that wasn't the trial theory, but this is a legal issue which we raised on a post-trial Rule 29 motion to state that notwithstanding our trial defense theory, as a matter of law, the jury's verdict could not be supported as a matter of law by skilling. But then you get back to Judge Diaz's roadblock. You can have both a conflict of interest and be accepting bribes. So they're not mutually exclusive propositions. So how do you answer that then? I would answer that in this case, even in the worst, the best light to the government, the only theory, the essence of it was not that he had a conflict of interest and was taking bribes. They argued that he was taking bribes only. They didn't argue conflict of interest at all, really. He didn't have to prove a violation of the statute, did they? No. But what we're saying is that based on skilling, he took official actions, which you can do, got remuneration from his actions, didn't disclose it to the public, but that wasn't a bribe in skilling. It was a conflict of interest. And that's what we heard in this case, Your Honor. The next issue, Your Honors, I'd like to address is issue number three. This is a motion, Rule 33 motion, for a new trial on all counts based on inadmissible testimony that was offered by a central government witness, Mr. Ronald Bloom, who was one of the alleged, one of the developers with whom Mr. Burford supposedly had an illicit relationship. Now, Mr. Boone's testimony was central to the government's case, and the government admitted that themselves at Mr. Boone's own sentencing. And this is at our brief at pages 54 and 55, where the government told the court at Mr. Boone's sentencing, and this is just government counsel, as the government explained in its motion, Rule 35 motion. And as the court saw with its own eyes as it presided over Mr. Burford's five-week jury trial, this defendant, Mr. Boone, has provided and continues to provide substantial assistance to the government. And then they said that, I'm quoting, that Mr. Boone's testimony was both candid and compelling. So the government can't argue that Mr. Boone wasn't critical to their case. And now, in addition, the testimony we objected to was this. Mr. Tommy Smeagol, a city council member and former colleague of Mr. Burford, said, there has always been a perception since I have been on counsel that Ronald Boone and the Boone family have been able to get whatever they want, and it doesn't matter that they aren't following the same rules as everybody else. Now, that was inadmissible opinion. It was inadmissible hearsay. It was 403 material, any probed value outweighed by the prejudicial effect for another councilman to basically opine that Mr. Boone is a corrupt person who is, in effect, in illicit relationships with other officials, is inadmissible. The trial judge agreed. There was no issue there. He sustained the objection. However, I also asked for a mistrial because I felt that it was too prejudicial to be cured even by a curative instruction. I did ask for a curative instruction subject to the mistrial, the objection in the mistrial motion because I felt I had a duty at that point at least to try and mitigate the damage as much as I could, but that doesn't, we didn't waive anything. And the, so the, there's no issue that Mr. Boone's testimony was central to this case. The government admits that. No issue, at least the trial judge, found that it was improper, sustained the objection, and gave a cautionary instruction. The only question before the court on this issue is, was it bad enough to result in a mistrial? And I would urge it is. Now, this court has held in the United States, we see right, it's cited in our brief 978 Fed Second 842, 1992 case from this court, that a mistrial should be granted where, quote, there is, there is, quote, a reasonable possibility that the jury's verdict was influenced by the material that improperly came before it. Which count of conviction relied on Boone's testimony? I would urge all of them, Your Honor, because the government's theory was that Mr. Burfitt was a corrupt public official, and that that pervaded and permeated every single count. Right, but the real cash was coming through the Etheridge's, right? Exactly. And Boone was the beach house, and what else? The beach house, and some turkeys, and some things. Right. But it was, and there were certain votes that he talked about, certain things that he expected Mr. Burfitt to do. It was almost a 404B type evidence admitted to show a common pattern of practice. It was... But you're saying the prejudice, it's not the fact that it was necessary for any conviction. Right, that's my contention, Your Honor. It's the prejudice, that's exactly right. It was so prejudicial, I mean, for the jury to have heard that, I mean, that, because they argued Mr. Boone's centrality in the trial, and they admitted it later, and he was a key guy. It was very important for them. They had these other witnesses. The essence of this case, the core of it for the government, really was still the sort of traditional immunized defendants, people with horrible criminal records. Mr. Etheridge admitted that he wholesale perjured himself in the prior trial, Bank of the Commonwealth, where he was convicted of fraud. I mean, that was just, all of that was uncontradicted, and they relied on this core, about four or five people, who were all either convicted felons or admitted, according to them, members of a scheme of bribery. So it wasn't like there was any real independent evidence, other than those people, in this case, that Mr. Burfitt was doing something wrong, and weighed against that. I've never seen it in my career. We had, I can't remember the number, I don't know whether it was 30 or 35 public officials, former city manager, present city manager, former council members, present council members, attorneys for the, city attorney, city attorney, present city attorney for Norfolk, former attorney for NRHA, attorneys for the parties, for TIVAS, who negotiated deals, a whole host of these people, all of whom would have been in a position to know if the allegation that Mr. Burfitt was there trying to help these people get projects and things, not a single witness, I don't think any government witness, other than those five or so core people, testified to that, and all the people you'd have to go to, to influence, all said Mr. Burfitt never solicited us or advocated for TIVAS. So my point is simply that this, the prejudice, this was a closer case, I think, than perhaps maybe the government would like to admit. It was a much closer case. And it came down to the credibility of these witnesses, as it often does in cases. But Mr. Boone was essential to showing that here we got TIVAS and their people, now we got a guy, Tommy Arne, as well, they were the three developers. So it was a triad, and they had to use Boone to buttress their theory of TIVAS and Arne. Arne was a horribly convicted felon, and again, the record shows all of that. So they needed Boone. And Boone, this testimony from the councilman, that Boone, in effect, was a corrupt guy in illicit relationships, allowed the inference that, yes, he's doing it with Mr. Burfitt. It corroborates the government's case. And the court found it shouldn't have been admitted, sustained the objection, and I say to the court that there is a possibility that the jury's verdict was influenced by this central figure the government put on. Now, as this court in Nyman said, that's 649, second 208, time goes fast, I've got 58 seconds. But in any event, this goes to everything. This is a mistrial on all of the counts. The closeness of the case, which I've argued to you, is not, this was not overwhelming evidence. There was a lot of immunized and convicted felon testimony, but not overwhelming evidence. It was a close case. The centrality of the issue affected by the error. Boone was a central figure. The government admits that. And the steps taken to mitigate the effects of the error. You have to balance those. And in this case, the court gave the curative instruction, but there are some cases where the bell cannot simply, can never be unrung, as they say. This bell rang too loud. The jury heard it. They shouldn't have. And it's our position, very respectfully, your honors, that it affected, that there's a possibility, as this court has held the standard, that the jury verdict was influenced by what they should not have heard. And that this case should be reversed on that ground alone, and sent back for a new trial. With two seconds left, I thank your honors very much for your attention, and I reserve four minutes for rebuttal. Thank you. Thank you, Mr. Sack. Yes, sir. Thank you, your honor. Mr. Lasagna? May it please the court. The defendant's appeal largely centers on the sufficiency of the government's evidence. However, Defendant Burfitt's convictions were supported by overwhelming evidence in this case. Over the course of five weeks, what was the evidence that he received, what was the physical evidence that he received this money? He says overwhelming. It's a lot of money he said he received, right? Correct. And did you, how much did you match with bank deposits, bank withdrawals, a lot of it? The defendant's bank records were in evidence, and there were summary charts about tracking those transactions. And there was a particular witness who testified that the defendant had $30,000 of unexplained cash deposits in his bank accounts. In addition, there were particular transactions that Dwight Etheridge testified where he withdrew $8,000 and three minutes later deposited $1,000 into Mr. Burfitt's car loan account. Three minutes later. And he testified that he did that in exchange for, that was a bribe payment in exchange for one of the votes that was coming up on one of the projects. And those deposits were corroborated by bank records? They were corroborated by bank records, your honor. All right, Dwight, go ahead. In addition to those records, there were seven cooperating witnesses who testified about their participation in a bribery scheme with Mr. Burfitt. That testimony was corroborated by multiple other witnesses in over 200 exhibits. Additionally, Defendant Burfitt testified in his own defense over the course of multiple days in which he was confronted with his own incriminating statements, his own oral statements, written statements, and these records. Accordingly, on that evidence, a jury, a rational jury could easily find convictions on six of the counts that he was convicted on. Let me address the two points that Mr. Sachs raised in his opening. The first issue is that the government only proved a conflict of interest and not a bribery scheme. As your honors have noted, every bribery scheme is an undisclosed conflict of interest. Politicians do not announce before their votes that, by the way, I'm voting I've been bribed by such and such developer. The two are not mutually exclusive. The facts are also important in this case. With respect to the $250,000 bribe related to Tyvest, the evidence at trial from multiple witnesses from Dwight Etheridge, Curtis Etheridge, Ricardo Lewis, they all testified that there was a meeting where Mr. Burfitt had demanded $250,000 of his shares in Tyvest in order to support Tyvest in seeking development projects such as the Broad Creek Villas. They pointed out in that meeting that Mr. Burfitt had invested no capital whatsoever into Tyvest at the time. They speculated why would we pay you $250,000 when you put nothing in. So Mr. Sachs' argument that this is somehow an undisclosed payout of his shares, there were no real shares. There was nothing that he had invested in Tyvest. It was merely a sham to cover up how he was going to receive these bribes. In addition, there were bribe payments after the $250,000 was satisfied. When we moved to the Midtown office tower, the $250,000 bribe payments had already been paid, yet Mr. Burfitt extracted additional funds from Tyvest. You can't relate that to the so-called shares that were in Tyvest, so those are just bribes. In addition, with respect to count two, count two involved more than the Tyvest relationship. It involved the Arnie relationship and the Boone relationship. And Mr. Sachs does not argue that there were any shares or some sort of undisclosed financial interest related to the Arnie relationship. That was just simply Mr. Arnie meeting him at a location and Mr. Burfitt asking for $25,000 for the mother of his children in order to qualify for a bank loan. And then the same thing with Mr. Boone. There's no pre-existing financial relationship between Mr. Boone and Mr. Burfitt. It's simply support my business interests in Oceanview in exchange for funds. So not only did the government charge a bribe scheme, the jury was, the evidence proved a bribe scheme, not a conflict of interest, and the jury was charged that the only way that they could convict on the bribery charges was if they found a quid pro quo relationship. The second issue that Mr. Sachs raised is the opinion testimony issue. And this was a, Councilman Schmeigel, who was one of Mr. Burfitt's colleagues at the time, testified. And there was a question about the amount of crime and sort of bad incidents related to Mr. Boone's bars in Oceanview. And offhand, Mr. Schmeigel made a comment that, you know, he always wondered why he never got, Mr. Boone never got in trouble for those events at his bars. And he essentially said, he's, you know, he's well-connected, he never got held to account for that. But he never connected the comment to Mr. Boone, I'm sorry, Mr. Burfitt. And if the comment was brief, it was one sentence long, it quite frankly could be interpreted as favorable for the defendant because it could provide another reason that, for why Mr. Boone received favorable treatment other than bribes. And then why did the court strike it? It seems to me you're arguing a little bit too far there. I mean, there certainly was the innuendo that Burfitt was getting something. Your Honor, the court was correct. It was opinion testimony. It was unnecessary. But this was a stray comment in a five-week trial with over 90 witnesses, over 200 exhibits. The idea that particularly after a cautionary limiting instruction where the testimony was stricken and a limiting instruction before the jury deliberated that any stricken testimony should be disregarded. The idea that this stray comment impacted the jury is just, it just strains credulity. And as this court knows under Nyman, the court must look at the closeness of the case, the centrality of the issue, and the steps made to mitigate the error. This case was not close. As Judge Morgan stated when he was discussing another issue, there's no way in the world that the court would ever believe that any of this new evidence would produce an acquittal. Mr. Boone's testimony was corroborated in a number of different ways, including all the people that verified that he took them to Mr. Boone's cottage. Mr. Boone wasn't the only person involved in the bribery scheme with Mr. Burfitt. He was just one of a few. I mean, there's no way that this would have turned his conviction with the great weight of the evidence the government presented. It was corroborated right down the line. So this was not a close case. And in addition with the mitigation steps. But a lot of people testified that Mr. Burfitt was an honest person of high caliber and credible, impeccable standards, correct? Correct. And they were, I mean, it's not a numerical balance, but it was way out of kilter in terms of his side. Yours was puny compared to the people. And matter of fact, the people who you had were people who had been convicted, weren't they? That's correct. You're on people who had an interest, right? That's correct, Your Honor. And you said this was a close case. For example, you, it was, when I say under government, the government came up with a theory of the silent partnership, didn't it? Through your evidence. Well, uh, that correct or not? The witnesses testified that there was a silent partnership. Your witnesses. Correct. That's what I'm saying. That's what I mean. The government built a case by evidence, right? Yes. Not theory. Yes, Your Honor. So you build that up that he had an interest, a silent interest. So you may have been hoisted on your own petard, maybe, like the French would say. Because you can have consideration in a partnership that's not cash-based, can you correct? Yes. Goodwill, for example. There are a lot of people, for example, who form a military, do pretty well, and you know, they spend some time in corporations and things like that in terms of equity interests that don't translate just in money. That's correct. But that's not just military. I'm just, just not to disparage military, but have other official business, right, correct? That's correct. But that's just not what the jury found in this case. No, I'm not talking about what the jury found. I'm talking about your evidence. Your evidence is that he was a silent partner, right? Correct. And that these shares didn't amount to anything because he didn't pay for them. And that was the basis for him receiving the money. That was your theory? That's correct, Your Honor. Okay. And so, when you say a conflict of interest, basically, the defense is saying that since you raised this and you built this up, this is no more than, this is my interest, just as with, for example, for example, would it be bribery if I had a sham, if I have a corporation, a real corporation, with an AKA, and they received, I was a sole shareholder, and they received government contracts, would that be bribery if I steered contracts to my solely held own corporation? It could be if you did so in exchange for those funds. If the reason that you- Bribery? Who'd I bribe? Well, through your official act, if you receive a payment through, I don't know how- A bribery doesn't require two people. Well, it does. At least two people. It would, Your Honor. That's what I'm saying. Well, where's the bribery? Well, in this case, there, well, in this case, there were other individuals. Deal with my hypothetical. Deal with my hypothetical. I'm the sole owner of this corporation, you know, assumed name, nobody knows I really own it, and then I get business for my corporation, I'm the only person they have any interest in. Why is that not just a conflict of interest? That's not bribery, is it? It may not be bribery. I think it could violate other statutes. Exactly, other statutes, but we're here to test whether or not the sufficiency as to what's charged, and you, the government, you put the theory together that this was a silent partnership, did you not? That we established. So you'd agree with my hypothetical, it wouldn't be bribery under the statute of conviction, correct? Under your honor's hypothetical, it's possible that that might not amount to bribery, but that's just, those weren't the facts here. The Tyvest Corporation was a vehicle for Mr. Burford to extract payments from Ricardo Lewis, Curtis Etheridge, and Dwight Etheridge. And that was proven by these three people? That was proven by all of these witnesses who testified that the only reason that he was involved in Tyvest was so that he could steer government contracts to them and to himself and that they would pay him in exchange for those official acts. That was the evidence, and the jury was entitled, quite frankly, on one witness the government could have prevailed, but they were, just for Tyvest, there were five, six, seven witnesses who all testified about this illicit agreement and the various payments that occurred. And let me also stress, even if Mr. Sachs is correct with respect to the $250,000 deal on Tyvest, the government proved beyond that. After the $250,000 was extracted, there were additional payments, thousands of dollars. There was a car that was paid, a Mercedes that was paid off. It had nothing to do with the $250,000 or the Broad Creek Villas. They related to the Midtown office tower and other NRHA projects that Mr. Burfoot steered as he continued to make demands. So even if we are wrong on, which we don't believe we are, on the $250,000, we still prevail on the other acts of bribery that we proved up. Let's move on to the conspiracy for wire fraud. Now, that was based on the fact that a credit card was used to pay taxes? Yes. Delinquent taxes. And that was a conspiracy. I thought that was just incidental. It's not incidental. It was actually an important step in the plot here. The facts were Mr. Burfoot had actually risen to be deputy city treasurer, chief deputy city treasurer at the point in time. He was intimately aware of the processes, how the treasurer's office paraded. Mr. Burfoot didn't have a care that Dwight Etheridge was a delinquent for several quarters on his city taxes for Tyvest. However, just before the last vote for the Midtown office tower, members of the public during a community session found out that Tyvest hadn't caught up on its city taxes, and they were understandably concerned about that. Mr. Burfoot had sent somebody to watch that meeting and report back. He immediately, upon learning this concerning information, told Dwight Etheridge, I won't be able to get the votes for you if you don't get your taxes paid. And I can't even vote for it. So he directed Dwight to pay the taxes on Monday morning. He then immediately called, Mr. Burfoot called his deputy in the treasurer's office and instructed her to prepare the taxes to be paid that following morning. They spoke, Etheridge and Burfoot spoke that morning. Mr. Etheridge came in, paid the taxes, and against treasurer's office policy, he used another person's credit card to make that tax payment. And how was that reasonably foreseeable to Mr. Burfoot? Well, it's reasonably foreseeable because he directed Mr. Burfoot, Mr. Etheridge, to go and make the tax payment. Well, he directed payment. He didn't direct the mode of payment. Correct. But it was reasonably foreseeable to him. He understood that there were probably three different modes of payment in the treasurer's office. You could pay by check, cash, and credit card payment. But the undisputed evidence in this test, in this record, is that he said you need to get there as soon as the doors open. This correct? Correct. So that would assume that it's going to be a physical payment, not a wire. That's what he said. Am I quoting the record correctly? It says you need to be there as soon as the doors open. That clearly has to be a doors open. You don't talk about wire transfer. You mean you need to be there physically, doors open, to pay it. Am I right? Am I wrong about that? I think you're right about the evidence. But on the law, in this circuit's law and in Pereira, there doesn't have to be agreement on how the particular wire is going to be used. There's no evidence that they anticipated in the wire. Matter of fact, it's just the opposite. Because it says as soon as the doors open, you need to be there to pay it. That would suggest not a wire at all. That's your evidence. Your Honor, under the Fourth Circuit law, as long as the defendant, it's reasonably foreseeable to him, or as long as he knows that in the ordinary course, a wire or mailing could result from his actions, that's sufficient. So what you're saying, then, is that because you could pay by cash, check, or credit card, that it was reasonably foreseeable that when he showed up, that he would try to do it by credit card. Correct. And that's all that's necessary. There was a one in three chance, you're saying, that he would pay by credit card as opposed to cash or check. Or did they accept check? I don't know whether they did. They accepted check. This is also, they were thousands of dollars in arrears. So the idea that he was going to come. A thousand or something. Correct. So the idea that he was going to bring on short notice before the banks potentially were even open, thousands of dollars in cash to the Treasurer's Office is just unlikely. He could have brought a check, I suppose. He could have brought a check, but Mr. Burford was also aware that Dwight Etheridge was. That would have amounted to a wire fraud, a check or not? Well, depending on the back end of how the check was processed. But I'll say, Your Honor, he paid in both ways to pay off these city taxes. He first brought a check, Mr. Etheridge, but it was insufficient. He didn't have enough funds to pay for the entire thing, so he borrowed his sister's credit card and paid the remainder of the overdue taxes. So he actually used two out of three methods. There's no evidence that the defendant knew that. Or have any reason to know that he would get it from a credit card from his relative, is there? Well, he did know that Mr. Etheridge was in. Yes, I would argue that circumstantially he knew that he had let him drive. Don't you think it's rare that people pay their taxes with a credit card? I actually think it's fairly common, Your Honor. Really? I think most people pay by check or credit card, and few people pay by cash. Oh, maybe you're right. I'm old. I'm old. And the other point is, even if the court were to accept that it's not reasonable, the wire, that only affects count two. Count one, the government proved up multiple wires. There was a wire transaction to actually fund the Broad Creek Villas that came from Colorado into Norfolk that Mr. Burfoot and Dwight Etheridge discussed how these transactions were going to work and how they were going to close. What was the evidence before the credit card payment that Burfoot knew that Dwight Etheridge was having financial problems? What was the evidence at trial? I believe Dwight Etheridge. To what extent did Burfoot know of Mr. Etheridge's financial plight at the time the credit card payment was made? So this is towards the end of the Midtown Office Tower. It's the last few votes. Dwight Etheridge's actual evidence was that he would try to resist some of these payments because he didn't have it. He had to borrow money from his brother, Curtis, at times. But also, quite frankly, the most persuasive evidence is after the Midtown Office Tower vote, after it passes but then the project fails, Mr. Burfoot stops demanding money from Etheridge because he knows he doesn't have any. Right. But, no, I'm saying before the payment was made in the Treasurer's Office. What was the evidence of Mr. Dwight Etheridge's financial plight? I think it's just the resistance of Dwight to make payments. And he also understood where Dwight's – the funds that Dwight had to bribe him. Did you say the resistance? The answer to Jez Keenan's question was the resistance of what? Dwight Etheridge would resist at times Burfoot's demands for additional cash because – A lot of rich people resist paying. That's fair enough. But also, Dwight, Mr. Burfoot was aware of where the funds were coming from. This is awfully speculative in this regard. And then you want us to leap to what was foreseeable and evidence that he was going to walk through the door. We have to just – I mean, incredible. I mean, I know it's one thing that is favorable to you in terms of emphasis, but we're getting really stretching for the government to say, maybe you had shown this element as to discount. I'm trying to overreach it. These wire in a case like this. We just believe, Your Honor, that the Fourth Circuit law doesn't require you to know that on a specific date and time the wire is going to happen. It has to just be reasonably foreseeable. In cases where you knew there was going to be a wire, you don't need to know what date it was. But here, that's not the case you have here.  Thank you, Your Honor. Thank you so much, Mr. Hassanier. Mr. Sachs, you have some time reserved. Again, may it please the Court. Several brief rebuttal points. First of all, returning to the motion for mistrial, which affects all counts. As I said, the pervasive effect of the reasonable possibility that this prejudiced this jury on everything. Mr. Boone was sent to this case to the allegations of corruption against Mr. Burfoot. And it was not, I submit to you, the case was much, much closer than the government will admit. And in fact, first of all, the comment was no stray comment. As Judge Keenan pointed out, at a bare minimum, the innuendo, you have to read it in the context of this trial, of this case. The whole thing is that Mr. Burfoot has got these corrupt relationships with these developers. And that's exactly what Tommy Smeagol said Mr. Boone does. He corroborated through an inadmissible piece of evidence that was, I submit, so prejudicial you can't cure it. The very theory of the government's case to support all these other convicted felons, including Mr. Boone himself, it was one, Dwight Etheridge, who again admitted rank perjury in a federal trial at the Bank of the Commonwealth. So I would submit to the court that this was, the comment, the testimony, was clearly something directed right at the heart of the core of the government's case. Now, weighed against that, as His Honor Judge Gregory has pointed out, there are too many references to the record for me to cite them in the time I have. I would respectfully recite pages seven and eight of my brief, the opening brief. At the bottom of page seven, the top of page eight, I summarized every joint appendix reference to the following. The defendant presented dozens and dozens of present or former city officials, as well as other professionals, attorneys, who all testified, I'm talking about dozens, that during the pertinent period of time the defendant never advocated for, solicited for, or otherwise sought help or assistance for Tyvest, Mr. Etheridge, Mr. Boone, or Mr. Arney, including seven council members with whom the defendant had served, two present or former attorneys for the Norfolk Redevelopment and Housing Authority, six present or former officials associated with the Norfolk Redevelopment and Housing Authority, including the present and former executive director, two commissioners from the NRHA, as well as other NRHA officials, attorneys who represented Tyvest, supposedly in which Mr. Burford has tried to help with all these people, and these are the attorneys for Tyvest in the negotiations with the city. They said Mr. Burford never tried to get the city. Mr. Sachs, though, that's a very persuasive jury argument, but the jury didn't buy it. I agree. So how does that translate into a legal argument? You've made the argument with regard to Spiegel's comment. How else does that translate into a legal argument? It translates, Your Honor, into the closeness issue, the legal question that Nyman said the three things you have to weigh when inadmissible evidence comes in, the closeness, the centrality, and the efforts to mitigate. And what I'm saying, it's a balance. What I'm saying is this case was far from a lot by the government, far from it. It was overwhelming defense evidence. We could not possibly, we wouldn't do it anyway, but theoretically if some corrupt defendant wanted to marshal a bunch of people to lie, it would be impossible. Sachs, let me, so I understand your argument with respect to this opinion testimony, but isn't essentially, wasn't essentially Mr. Boone making the point that he made via his fact testimony that your client was corrupt? I mean, he testified that he was engaged in corrupt behavior, and so he simply gave an opinion consistent with that testimony. What's, I understand that it was inadmissible, it was improper, should not have been given, but I don't, I'm struggling to find why it's of significant import, given all the other evidence in this case and his direct testimony that, in fact, your client was engaged in criminal behavior. Well, and I want to say this, Your Honor, I'm not arguing with you, but I don't think the record supports, it's not, Mr. Boone didn't, I see my time is up today, my answer. You may ask. The record doesn't show that Mr. Smigel made any kind of really, of any direct allegations of criminal conduct. He testified about some circumstances involving a vote. Mr. Smigel, I misspoke. Go ahead. Smigel testified about some circumstances about one vote that the government tried to argue supported the position, their position, but Mr. Smigel gave no direct evidence of illicit activity, but he did give direct evidence of Mr. Boone being in illicit relationships with people implying like Mr. Burfoot. That's the point I make, Your Honor. Mr. Sykes, I want to ask you one question. Yes, sir, Your Honor. You keep your answer very brief. I will, sir. But as much as you need to explain it. I'll be as brief as I can. If, I know these people who testified, everyone who testified against your client, against your client, and there was puny in terms of numbers as opposed to those four, but if the jury believed what those few people said, if they believed it, was that enough evidence to convict your client of what he was charged with, if they believed what they said? Putting aside all the legal arguments that we've argued about, yeah, if they believed them, then those facts would be established, yes. But my point is when you weigh that core, that group of four or five criminals, against 30 or 40 diverse city officials present from all different angles. Point well taken. Point well taken. Right. You think in terms of just the. The closeness issue. But that goes to credibility. It does, but in the mistrial question, the closeness factor. Oh, I agree. I agree. That's where that comes from. Point well taken on that. But the other part is credibility. I agree. I agree, sir. Giannis, thank you very much. Thank you very much for your arguments. We're going to come down and re-counsel. We're going to ask the clerk to have a brief recess so we can reconstitute the panel today.
judges: Roger L. Gregory, Barbara Milano Keenan, Albert Diaz